**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.:

NICHOLAS MUNDEN,

      Plaintiff,

v.

MICHAEL PINEDA, individually;
CITY AND COUNTY OF DENVER, a municipality,

      Defendants.

---

**CIVIL RIGHTS COMPLAINT WITH REQUEST FOR TRIAL BY JURY**

---

Plaintiff Nicholas Munden, by and through his attorneys, Robinson & Henry, P.C., hereby complains against Defendants and requests a trial by jury as follows:

### I.    <u>INTRODUCTION</u>

1.    On or about May 9, 2022, Nicholas Munden ("Mr. Munden"), a guest at the Denver Art Hotel (the "Hotel"), was subject to unreasonable and excessive force by Denver Police Department Officer Michael Pineda ("Officer Pineda"), who repeatedly tased an unarmed Mr. Munden on multiple parts of his body, in violation of the Denver Police Department Operations Manual, and beat Mr. Munden with a baton despite him being unarmed and not committing a form of active aggression.

2.    Mr. Munden had to be taken to the hospital where he was treated for assault-related injuries of altered mind state, post electrical shock symptoms, and multiple electrical burns on his stomach, inner thigh, and shoulder as well as an acute traumatic injury to his shoulder for which he continues to require medical care.

3.    Following the improper use of excessive force against Mr. Munden, Officer

Pineda prepared a police report misstating the factual circumstances of the encounter in an apparent attempt to conceal his gross and inappropriate use of excessive force. Officer Pineda falsely asserted that Mr. Munden intentionally caused bodily injury to Officer Pineda; that he knowingly attempted to remove the self-defense electronic control device, direct-contact stun device, or other similar device; that he threatened physical force or violence; and that he knowingly obstructed, impaired, or hindered the enforcement of the penal law or preservation of the peace; when in fact, at the time Officer Pineda tased Mr. Munden while he was unarmed, using his cell phone and not actively posing a threat to Officer Pineda or others.

## II.    <u>JURISDICTION AND VENUE</u>

4.    This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

5.    The Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331.

6.    This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

## III.    <u>PARTIES</u>

7.    Mr. Munden hereby incorporates all the forgoing paragraphs of this Complaint as fully set forth herein.

8.    At all times relevant hereto, Plaintiff Nicholas Munden was a resident of the State of Colorado, and a citizen of the United States of America.

9.    At all times relevant hereto, Defendant Officer Pineda was a citizen of the United States and a resident of the State of Colorado and was acting under color of state law in his capacity as a law enforcement officer with the Denver Police Department.

10.     The City and County of Denver ("Denver") is a Colorado municipal corporation.

Denver's Department of Safety is responsible for the oversight, supervision, and training of the

Denver Police Department ("DPD"). Denver was at all relevant times the employer of Officer

Pineda and is a proper entity to be sued under 42 U.S.C. § 1983.

## IV.    STATEMENT OF FACTS

### A.    The Morning at the Art Hotel Denver

11.     Mr. Munden hereby incorporates all the forgoing paragraphs of this Complaint as

fully set forth herein.

12.     On May 9, 2022, Mr. Munden arrived at the Art Hotel Denver, Curio Collection

by Hilton (the "Hotel"), located at 1201 Broadway St. Denver, CO 80203, to check in for a

reservation he scheduled online. *See* **Exhibit 1** - Screenshot of Confirmation of Reservation.

13.     Shortly thereafter, Officer Michael Pineda arrived at the Hotel.

14.     The initial interaction between Officer Pineda and Mr. Munden was captured in

part on Officer Pineda's bodycam video.  *See* **Exhibit 2**

15.     The bodycam video shows Officer Pineda walking down a set of stairs in the

Hotel when he comes upon Mr. Munden standing outside the third-floor door.

16.     There is no sound at this point in the video.

17.     Mr. Munden is attempting to confirm his reservation on his phone and asks

Officer Pineda how his day is.

18.     Mr. Munden's demeanor was calm and non-threatening.

19.     Mr. Munden gave no indication that he was armed or possessed a weapon of any

sort.

20.     At this time, Matthew Swisher, the Hotel manager ("Mr. Swisher") tells Officer

Pineda that he wants Mr. Munden to leave due to complaints from other guests in the Hotel.

21.     The alleged complaints were of a non-violent nature.

22.     Officer Pineda tells Mr. Munden that he is under arrest.

23.     Officer Pineda then violently grabs and squeezes Mr. Munden by the arm/shoulder to place him in a restraint.

24.     Mr. Munden out of instinct to protect oneself pushes back on Officer Pineda and tells him not to touch him.

25.     It appears that Officer Pineda then knocks off his bodycam.

26.     The bodycam video is blank because at this point it is facing the ground, but footsteps can be heard running away from the scene.

27.     Of import here is that at no time prior to the aggressive physical contact from Officer Pineda did Mr. Munden display any threatening facial expressions or bodily movements.

28.     The next time we see Mr. Munden and Officer Pineda is via security camera footage located in the Hotel's front lobby.   *See* **Exhibit 3**

29.     The footage shows Mr. Munden re-enter the Hotel with an individual believed to be Mr. Swisher.  Both men stop in the lobby and appear to be in conversation.  Neither had threatened assault or were engaging in an assault.

30.     Officer Pineda enters shortly thereafter with his baton drawn and rushes Mr. Munden.

31.     Hotel footage shows Mr. Munden shuffle his feet, place his phone in his back pocket, and attempt to back away from Officer Pineda.

32.     Officer Pineda then violently strikes Mr. Munden in the knee area of the leg with his baton.

33.    Mr. Munden repeatedly flinches in fear for his safety.

34.    Officer Pineda then takes a two-handed stance and approaches swinging his baton at unarmed Mr. Munden.

35.    Officer Pineda then strikes Mr. Munden on the arm with the baton.

36.    In an attempt to stop the attack on him, Mr. Munden reaches for the baton.

37.    Mr. Munden then begins his retreat.

38.    Mr. Munden moves behind a sculpture placing it between him and a baton wielding Officer Pineda in an attempt to create space between the two.

39.    Officer Pineda draws his taser at this time and directs it at Mr. Munden. *See* **Exhibit 3** at 1:00.

40.    Mr. Munden then puts his hands on his knees, standing, facing Officer Pineda. *Id.*

41.    Upon information and belief, Officer Pineda had already radioed for backup, which he knew was in route to the Hotel to provide assistance. *Id.*

42.    Mr. Munden then takes his cell phone out from his back pocket and begins using the device with both hands. *Id.*

43.    Approximately 44 seconds after Officer Pineda originally drew his taser and with Mr. Munden's attention diverted from Officer Pineda, Officer Pineda takes that opportunity to fire the taser at Mr. Munden striking him in in the chest. *Id.*

44.    Mr. Munden immediately falls to the ground landing on his left shoulder. *Id.*

45.    Officer Pinda moves around the statute and shoots Mr. Munden a second time with the Taser approximately 5 seconds after the initial shot was fired. *Id.*

46.    With Mr. Munden still on the ground and only 10 seconds after firing the second

Taser shot, Officer Pineda then drive tases[1] Mr. Munden while he remains on the ground.  *Id.*

47.     At this point, another officer, Officer Singapuri then enters the scene.  *Id.*

48.     Mr. Munden screams for help in fear for his life. *Id.*

49.     Officer Pineda, ten seconds after the first drive tase and within 30 seconds of shooting Mr. Munden two other times with the taser, drive tases Mr. Munden again. *Id.*

50.     Officer Singapuri does nothing to restrain Officer Pineda from continuing to assault Mr. Munden. *Id.*

51.     A third Officer, Officer Logue, grabs Mr. Munden by his legs and the three Officers flip him over to his stomach. *Id.*

52.     The right side of Mr. Munden's face is facing upward toward Officer Pineda. *Id.*

53.     Officer Pineda still has the taser in his right hand.  *Id.*

54.     At two minutes and forty-one seconds into the Hotel footage, Officer Pineda can be seen moving the taser toward Mr. Munden's head. *Id.*

55.     At two minutes and forty-six seconds Officer Pineda appears to place the taser near Mr. Munden's head for a second time.   *Id.*

56.     Despite having three Denver Police Officers on top of Mr. Munden, Officer Pineda continued to push the taser against Mr. Munden's head.  *Id.*

57.     Neither of the other officers on scene do anything to restrain Officer Pineda from continuing to use this level of force against an unarmed and restrained Mr. Munden. *Id.*

58.     Mr. Munden was ultimately taken to Denver Health and Hospital (the "Hospital") following this excessive use of force.

---

[1] Drive-stun capability is available with or without a TASER cartridge installed. To apply a drive-stun,  the user pushes the front of the CEW firmly against the body of the subject. Drive-stun is only effective while the CEW is in contact with the subject or when pushed against the subject's clothing.  *See* https://my.axon.com/s/article/Drive-stun-backup-x26p?language=en_US

59.     As shown in body camera footage, Officer Sergeant Kelly, Badge No. 9147 interrogated Mr. Munden while he was at the Hospital. *See* **Exhibit 4.**

60.     Sergeant Kelly asks Mr. Munden if he wants to tell him what happened today.

61.     Mr. Munden explains that he attempted to show Officer Pineda his Hotel confirmation number prior to being swung at, and then describes the attack from Officer Pineda with the baton.

62.     Mr. Munden again tries to explain that he just wanted to show Officer Pineda his Hotel confirmation code.

63.     At four minutes and thirteen seconds, Mr. Munden describes Officer Pineda pushing the taser against the right temple of his head and pulling the trigger.  *See* **Exhibit 4**

64.     Sergeant Kelly continues asking Mr. Munden questions about the morning on camera.

65.     Sergeant Kelly then takes pictures of the visible wounds on Mr. Munden's body.

66.     Although there is a clear difference between the right and left temple on Mr. Munden's head, Sergeant Kelly states that he didn't "really see anything on your head."

67.     There is a clear injury similar to the other taser marks on Mr. Munden's body in the exact spot where he was tased by Officer Pineda. *See* **Exhibit 5** and **Exhibit 6**.

68.     Sergeant Kelly next asks if Mr. Munden remembers attacking Officer Pineda in various ways.

69.     When Mr. Munden begins explaining that he never attacked and merely defended or ran, Officer Kelly speaks over him, effectively cutting off his response.

70.     The use of force against Mr. Munden by Officer Pineda was gross, excessive, and in violation of the Denver Police Department's Operations Manual.

7

### B.    Police Reports Following the Incident
*Officer Pineda's Statement of Probable Cause*

72.    Officer Pineda's Statement of Probable Cause states that Mr. Munden struck Officer Pineda in the mouth with a closed fist causing pain and minor swelling.

73.    There is no video evidence of Mr. Munden ever striking Officer Pineda in the mouth with a closed fist.

74.    Video of Officer Pineda on the date of the incident fails to demonstrate any visual evidence of a strike to his face.

75.    The Statement of Probable Cause goes on to state that when Officer Pineda and Mr. Munden reentered the Hotel, it was Mr. Munden who took an aggressive posture toward Officer Pineda.

76.    Officer Pineda initiated an aggressive posture.  Mr. Munden responded with a defensive posture.

77.    It is averred by Officer Pineda that, when the parties were on the ground, Officer Pineda stunned Mr. Munden in the back, and torso to no effect.

78.    No other tasing is mentioned once Officers Singapuri and Logue enter the scene.

*Officer Pineda's Initial Report/Narrative*

79.    In this report Officer Pineda again reiterates that Mr. Munden punched him in the mouth, right lip area causing pain, and that he struck back hitting Mr. Munden in the face with a closed fist.

80.    Again, he reiterates that Mr. Munden took an aggressive stance, despite video evidence showing that Officer Pineda was the initial aggressor.

81.    Officer Pineda lastly refers to two cartridges being fired from the stun gun and two drive stuns being employed.

*Statement of Officer John D. Singapuri*

82.     Officer Singapuri's statements contain information relating to placing his body weight on Mr. Munden's legs to prevent kicking, and manipulating Munden's body to utilize his handcuffs.

83.     Officer Singapuri's report is void of any content regarding Officer Pineda's actions during this time.

*Statement of Officer John Logue*

84.     Officer Logue in his Statement claims to have seen at least two drive stuns to the torso of Mr. Munden.

85.     Officer Logue retrieved four (4) taser probes from the ground.

*Supplementary Report and Follow-Up Investigation of Detective Brian D. Sides*

86.     On May 10, 2023, Detective Brian D. Sides ("Detective Sides") took a statement from Officer Pineda regarding the incident that is the basis for the subject matter of this Complaint.

87.     Officer Pineda states in this report that he punched Mr. Munden in the left temple once and then two more times in the facial area.

88.     Detective Sides' follow-up investigation states that the details provided by Officer Pineda and the cover officers were confirmed by the provided footage.

89.     Ultimately, Detective Sides considered the case "cleared by arrest."

*Sergeant Ron Kelly's Supervisor's Use of Force Report*

90.     Sergeant Ron Kelly's report states that when contact first occurred, Officer Pineda "reached out to control Munden. . .".

91.     The report further states that the alleged punch to the lip of Officer Pineda by Mr.

Munden caused pain, but no visible injury.

92.     The report goes on to state that lay witness, Matthew Swisher, Manager of the Hotel and not an officer or individual with apparent expertise with respect to police use of force practices, told Sergeant Kelly that he thought the officers' actions were appropriate and not excessive in any way.

93.     Another lay witness, Faith Riggs, is named in the report.

94.     Sergeant Kelly furthers his narrative of reasonableness from unqualified individuals by reporting that she believed the actions of the officers were very appropriate.

95.     Sergeant Kelly reports that Faith Riggs stated that the tasing of Mr. Munden in the head did not occur, however, this statement is incomplete.

96.     Faith Riggs tells Sergeant Kelly that Mr. Munden had a key to the fitness center.

97.     Faith Riggs also state in the video interview that Mr. Munden was not tased in the head, but this was in the context of while Officer Pineda and Mr. Munden were still standing.

98.     Faith Riggs goes on to state that she thought Mr. Munden was tased three times.

99.     It is important to note that Matthew Fisher has not in any way been qualified as a witness who understands the Denver Police Department's Operations Manual, thus he is not qualified to opine on the appropriateness of force used, yet Sergeant Kelly used his statement to help frame the officers' narrative.

100.     Sergeant Kelly ultimately determined that, based on all the evidence and statements gathered, there was no need for further investigation.

101.     Despite video evidence and a statement to the contrary, Sergeant Kelly chose to ratify the excessive use of force.

## V.     ARGUMENT

A.      **Denver Police Department Failed to Investigate and Discipline Officer Pineda**

102.    Mr. Munden hereby incorporates all the forgoing paragraphs of this Complaint as fully set forth herein.

103.    In his Supervisor's Use of Force Report, Sergeant Kelly determined that it was not necessary to perform an investigation into the conduct of Officer Pineda.

104.    Despite Mr. Munden's statement that he was tased in the head, body camera evidence from the hospital that Mr. Munden sustained a wound in the exact location he says he was tased, and security footage from the Hotel where it appears that Officer Pineda places the taser against the right side of Mr. Munden's head, there was no investigation into this conduct.

105.    The Denver Police Department's goal for both the protection of officers and the community is that officers use non-force alternatives, including de-escalation[2], before resorting to the use of force. *See* Denver Police Department Operations Manual § 105.02(1).

106.    Additionally, Officers are reminded to comply with the use of force policy when dealing with uncooperative individuals, including the use of de-escalation techniques, when reasonable. *Id.*, § 113.00(1)(j)(1).

107.    The use of a controlled electronic weapon ("CEW" or referred to herein so far as "taser") under the Operations Manual use of force policy is permitted only under certain enumerated circumstances.

108.    One such situation is to incapacitate, safely control, or take into custody an

---

[2] "De-Escalation: Actions or verbal/non-verbal communication during a potential force encounter used to stabilize the situation and/or reduce the immediacy of the threat, so that more time, options, and resources are available for resolution without the use of force or with a reduced type of force, or reducing or ending a use of force after a resistance or threat has ceased or diminished. When possible, de-escalation must be used before resorting to the use of physical force." Denver Police Department Operations Manual § 105.01(2).

individual whose conduct rises to Active Aggression[3]. *Id.*, § 105.02(4)(e)(1).

109.    When utilizing a CEW, only the minimum number of energy cycles necessary to place the individual into custody will be used. *Id.* § 105.02(4)(e)(3).

110.    The Operations Manual prohibits use of the CEW in any environment where an officer knows or should have known that the neuromuscular incapacitation could cause an injury more significant than intended. *Id.*, § 105.02(4)(e)(4).

111.    Denver Police Officers shall not target the head, eyes, throat, neck, genitalia, pelvis, or spinal column with less lethal weapons. *Id.*, § 105.02(4)(e)(2); *see also* § 105.02(4)(b)(1).

112.    Officer Pineda failed to de-escalate the situation when he violently grabbed Mr. Munden by his shoulder in the stairwell during their initial encounter.

113.    At the time Officer Pineda chose to fire his taser at Mr. Munden the first time, Mr. Munden was unarmed.

114.    At the time Officer Pineda chose to fire his taser at Mr. Munden the first time, Mr. Munden was not making any overt acts consistent with an assault.

115.    At the time Officer Pineda chose to fire his taser at Mr. Munden the first time, Mr. Munden was not threatening assault.

116.    At the time Officer Pineda chose to fire his taser at Mr. Munden the first time, Mr. Munden was standing idly behind a statue looking down at his cell phone.

117.    At the time Officer Pineda chose to fire his taser at Mr. Munden the second time, Mr. Munden was unarmed.

---

[3] The Denver Police Department defines Active Aggression as an overt act or threat of an assault, coupled with the present ability to carry out the action, which reasonably indicates that an assault or injury to a person is likely. *Id.*, § 105.01(3)(e).

118.     At the time Officer Pineda chose to fire his taser at Mr. Munden the second time,
Mr. Munden was not making any overt acts consistent with an assault.

119.     At the time Officer Pineda chose to fire his taser at Mr. Munden the second time,
Mr. Munden was not threatening assault.

120.     At the time Officer Pineda chose to fire his taser at Mr. Munden the second time,
Mr. Munden was on the ground reeling in pain from Officer Pineda having shot him with his
taser seconds earlier.

121.     At the time Officer Pineda chose to drive stun Mr. Munden the first time, Mr.
Munden was unarmed.

122.     At the time Officer Pineda chose to drive stun Mr. Munden the first time, Mr.
Munden was not making any overt acts consistent with an assault.

123.     At the time Officer Pineda chose to drive stun Mr. Munden the first time, Mr.
Munden was not threatening assault.

124.     At the time Officer Pineda chose to drive stun Mr. Munden the first time, Mr.
Munden was lying on the ground reeling in pain from Officer Pineda having shot him twice with
a taser only seconds earlier.

125.     At the time Officer Pineda chose to drive stun Mr. Munden the second time, Mr.
Munden was unarmed.

126.     At the time Officer Pineda chose to drive stun Mr. Munden the second time, Mr.
Munden was not making any overt acts consistent with an assault.

127.     At the time Officer Pineda chose to drive stun Mr. Munden the second time, Mr.
Munden was not threatening assault.

128.     At the time Officer Pineda chose to drive stun Mr. Munden the second time, Mr.

Munden was on the ground reeling in pain from Officer Pineda having shot him with his taser twice and drive stunning him seconds earlier.

129.    At the time Officer Pineda chose to drive stun Mr. Munden the second time, Officer Pineda's back up officers had arrived and were already assisting with detaining Mr. Munden.

130.    It is a per se violation of the Denver Police Department's Operations Manual to tase individuals in the head and in the back / spinal column.

131.    Officer Pineda should have known that this act could cause more significant injury than intended, but rather than using the minimum number of energy cycles necessary to place Mr. Munden into custody, Officer Pineda continued to push his taser against Mr. Munden's head after he was on the ground, under the weight of multiple Denver Police Officers, causing significant injury.

132.    By committing the aforementioned acts, Officer Pineda used excessive force upon Mr. Munden in violation of the Denver Police Department's Operations Manual and the Fourth Amendment of the Constitution of the United States.

**B.    Officer Pineda's Alleged History of Misconduct**

133.    Upon information and belief, at the time of this incident involving Mr. Munden, Officer Pineda was under investigation by the Denver Police Department for felony theft from the Police Department.

134.    Upon information and belief, the Denver Police Department began investigating Officer Pineda after April 15, 2022 when he was not present for a scheduled non-department paid off-duty job.

135.    Upon information and belief, the Denver Police Department identified 23 shift

discrepancies where Officer Pineda reported working and collected pay but had not in fact worked.

136.    Upon information and belief, the Denver Police Department discovered that Officer Pineda had submitted inaccurate time sheets going as far back as October 2021.

137.    Despite having this knowledge on and prior to May 9, 2022, the DPD permitted Officer Pineda to continue to be on solo active patrol responding to calls with the general public under the color of law.

138.    On July 26, 2022, Officer Pineda was charged with felony theft and taken into custody.

### C.    Denver Police Department Has a Custom, Practice, and Policy of Excessive Force & Unlawful Seizures

139.    Mr. Munden's injury at the hands of Officer Pineda is another disappointing example of the shockingly common use of excessive force by the Denver Police Department's law enforcement officers that has been tolerated by the City of Denver for many years.

140.    The City of Denver's failure to properly train, discipline, and supervise an officer it was actively investigating for fraud, or at a minimum, further investigate the conduct of Officer Pineda with respect to this use of force is indicative of a broader pattern of wrongdoing within the Denver Police Department.

141.    Mr. Munden's case is another example of the customs, habits, and practices by the Denver Police Department that condones excessive force.  Here, as well as with many other cases, it was initially determined that no further investigation was necessary into the conduct of Officer Pineda, when in reality, his conduct was per se out of compliance with the established police training of the Denver Police Department.

142.    The City of Denver has created, fostered, and tolerated an environment and

culture of law enforcement brutality and deliberate indifference to the constitutional rights of citizens and residents.

143.    Denver law enforcement officers have engaged in a repeated practice of misconduct, and the officials responsible for ensuring proper conduct on the part of the law enforcement officers have consistently failed to train, supervise, and discipline officers who have engaged in such misconduct.

144.    In *Ortega, et al. v. City and County of Denver, et al.*, 944 F. Supp. 2d 1033 (D. Colo. 2013), the U.S. District Court for the District of Colorado found that the four plaintiffs in that case had met their burden to survive summary judgment on municipal liability as to their claims of excessive force based on three separate theories: (1) Denver's inadequate training of DPD Officers on use of force, (2) Denver's failure to adequately investigate complaints of DPD Officers' excessive force and discipline officers who used excessive force, and (3) Denver's custom of tolerating DPD Officers' "code of silence" with respect to uses of force.

145.    This finding was based in part on evidence which included (1) testimony from Denver's former Manager of Safety, Charlie Garcia, who stated that he believed DPD Officers had used "heavy handed tactics" since 1993 and that these tactics were a result of DPD's training policy; (2) testimony from Denver's former Independent Monitor, Richard Rosenthal, who stated that Denver had a "systemic problem" of officers not being held accountable for their uses of force; (3) evidence of numerous specific instances in which DPD IAB failed to adequately investigate a citizen complaint of excessive force and an implicated officer was not disciplined; and (4) testimony from former Manager of Safety Garcia that he had observed a pattern of failure to report uses of force.

146.    Another example of a DPD Officer using excessive force with a taser against an

unarmed citizen occurred in the case of *Heard v. Dulayev* No. 17CV1936, (U.S. Dist. Ct. Colo). In *Heard,* the Plaintiff was an unarmed man who, while complying with Officer Dulayev's instructions to exit from a bush with his arms raised, was tased in the chest by Officer Dulayev. Thereafter, other officers and supervisors made reports directly contradicting the video body cam evidence of what occurred in an attempt to justify Officer Dulayev's use of force.  DPD condoned Officer Dulayev's actions and the objectively inaccurate reports submitted by other officers in failing to take any disciplinary action against the Officers involved.

147.    For length and notice pleading rules required of Complaints, Mr. Munden does not list the many examples of the rampant use of excessive force (including deadly force) by Denver law enforcement officers over the years, which demonstrates the lack of any training or supervision on the part of the City and County of Denver to prevent this unconstitutional conduct. *See* North Denver News article titled: Denver has the second highest rate of death from law enforcement in the country.  https://northdenvernews.com/denver-secondhighest-rate-death-law-enforcement-country/.

148.    These examples are relevant here as Officer Pineda's inadequate training, supervision, and discipline with regard to the use of force led to the injuries sustained by Mr. Munden.  In other words, the rampant failures committed by the City of Denver resulted in the violent assault on Nicholas Munden.

149.    As a proximate result of Defendants' unlawful conduct, Mr. Munden has suffered actual physical and emotional injuries, and other damages and losses as described herein, entitling him to compensatory and special damages, in amounts to be determined at trial.

150.    Mr. Munden continues to suffer ongoing emotional distress, including severe distrust of police and society, as a result of the unreasonable excess force employed during his

seizure.

151.    Mr. Munden may also seek punitive damages against Officer Pineda to redress his

willful, malicious, wanton, reckless conduct and attempted cover-up of this civil rights violation.

## VI. <u>CLAIMS FOR RELIEF</u>

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Excessive Force in Violation of The Fourth Amendment**
(Plaintiff Against Defendants)

152.    Mr. Munden hereby incorporates all of the foregoing paragraphs of this

Complaint as fully set forth herein.

153.    42 U.S.C. § 1983 provides in pertinent part that:

> Every person, who under color of any statute, ordinance, regulation, custom
> Or usage of any state or territory or the District of Columbia subjects or
> causes to be subjected any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any rights, privileges or
> immunities secured by the constitution and law shall be liable to the party
> injured in an action at law, suit in equity, or other appropriate proceeding for
> redress . . .

154.    Mr. Munden is a citizen of the United States and the individual police officer,

Defendant Officer Pineda, is a person for purposes of 42 U.S.C. § 1983.

155.    Officer Pineda, at all times relevant hereto, was acting under the color of state law

in his capacity as a Denver police officer, and his acts or omissions were conducted within the

scope of his official duties or employment.

156.    At the time of the complained of events, Mr. Munden had a clearly established

Constitutional right under the Fourth Amendment to be secure in his person from unreasonable

seizure through excessive force by law enforcement.

157.    Any reasonable police officer knew or should have known of this right at the time

of the aforementioned conduct as it was clearly established at that time.

18

158.     Officer Pineda's use of force was objectively unreasonable, per se in violation of the Denver Police Department's Operations Manual, and in direct violation of Mr. Munden's Fourth Amendment right to be free from excessive force.

159.     It was objectively unreasonable and per se in violation of the Denver Police Department's Operations Manual to tase Mr. Munden as he was not displaying Active Aggression at any point immediately before, during or after Officer Pineda fired at least two taser shots at him, drive stunned him at least two times and pressed his taser against Mr. Munden temple.  These acts, absent Active Aggression, violated the Denver Police Department Operations Manual.

160.     Some of these acts were committed in front of other Denver Police Department Officers who failed to intervene to prevent further harm to Mr. Munden when they could have done so.

161.     Officer Pineda engaged in the acts and omissions described herein pursuant to the custom, policy, and practice of Denver, which encourages, condones, tolerates, and ratifies the use of excessive force and deprivation of constitutionally protected interests by law enforcement officers, despite have policies to the contrary.

162.     The acts and/or omissions of Defendants were the legal and proximate cause of Mr. Munden's damages.

163.     As a proximate cause and result of Defendants' unlawful conduct, Mr. Munden has suffered actual physical bodily and emotional injuries, and other damages, and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, great pain and emotional distress.

164.    Mr. Munden is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowed by federal law.

165.    In addition to compensatory, economic, consequential and special damages, Mr. Munden may be entitled to punitive damages against Defendant, in that his actions were taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of Mr. Munden.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Failure to Train and Supervise**
(Against the City and County of Denver)

166.    Mr. Munden hereby incorporates the foregoing paragraphs of this Complaint as fully set forth herein.

167.    City and County of Denver failed to properly train, supervise, and discipline its employees, including Officer Pineda, with respect to the use of excessive force.

168.    City and County of Denver's failure to, in its supervisory duties, adequately train, supervise, and discipline its officer with respect to the use of excessive force is a custom, policy, or practice of Denver Police Department and a moving force behind the constitutional violations described herein.

169.    City and County of Denver has a culture of tolerative excessive force by its law enforcement officers.

170.    The constitutional violations against and harming of Mr. Munden was a foreseeable consequence of City and County of Denver's actions and inactions.

171.    City and County of Denver was deliberately indifferent to the constitutional rights of its citizens by failing to properly train, monitor, supervise, and discipline its employees with respect to the use of excessive force. City and County of Denver could have and should have pursued reasonable methods of training, monitoring, supervising, and disciplining its employees.

172.     Denver's policies, customs, and/or practices in failing to properly monitor, train, supervise, and discipline its employees were the moving force and proximate cause of the violation of Mr. Munden's constitutional rights.

173.     The acts or omissions of City and County of Denver caused Mr. Munden damages in that he suffered extreme physical and mental pain during and after the assault.

174.     The actions or omissions of City and County of Denver as described herein deprived Mr. Munden of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and has caused him other damages.

**THIRD CLAIM FOR RELIEF**
**C.R.S. § 13-21-131 – Colo. Const. Art. II, Section 25**
**Excessive Force**
(Against Officer Pineda)

175.     Mr. Munden hereby incorporates the foregoing paragraphs of this Complaint as fully set forth herein.

176.     Defendant Officer Pineda was acting under color of state law in his actions and inactions at all times relevant to this Claim. "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

177.     Mr. Munden had a protected Colo. Const. Art. II, Section 25 interest against deprivation of life, liberty, or property without due process of law. By causing excessive force to be used against Mr. Munden, Officer Pineda violated Mr. Munden's right to substantive due process under the law.

178.     Officer Pineda engaged in use of force that was objectively unreasonable based on the facts and circumstances confronting him, violating Mr. Munden's rights.

179.     Officer Pineda took an active part in the use of force, and no official intervened to prevent their fellow officers' use of obvious excessive force.

180.    Officer Pineda's actions and inactions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Mr. Munden's rights.

181.    The acts and omissions of Officer Pineda, were the legal and proximate cause of Mr. Munden's damages.

182.    Officer Pineda's acts and omissions were engaged pursuant to the customs, policies, and practices of the Denver Police Department, who encourage, condone, tolerate, and ratify the use of excessive force by their law enforcement officers.

183.    Officer Pineda's acts or omissions caused Mr. Munden damages in that he suffered severe pain, helplessness, and humiliation, resulting in serious physical and mental injuries and trauma.

## VII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Nicholas Munden, respectfully requests that this honorable Court enter judgment in his favor and against each of the Defendants, and award him all relief allowed by law, including but not limited to the following:

A.    Compensatory and consequential damages, including damages for physical injuries, emotional distress including but not limited to upset, anger, flashbacks, loss of trust, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

B.    Special damages including for all past and future health, medical, psychological care and charges in an amount to be determined at trial including sums to satisfy any lien interests;

C.    Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988

and or Colo. Rev. Stat. § 13-21-131;

D.    Pre-and post-judgment interest at the lawful rate; and

E.    Any further relief as this court deems just and proper, and any other relief at law

or in equity.

**PLAINTIFF HEREBY REQUESTS A TRIAL BY JURY.**

Respectfully submitted, this **March 23, 2023.**

<u>/s/ *Jon M. Topolewski*</u>
Jon. M. Topolewski, Esq.
Matthew W. Hamblin, Esq.
ROBINSON & HENRY, P.C
216 16th Street, Suite 750
Denver, CO 80202
Telephone: (303) 688-0944
FAX: (303) 284-2942
E-mail:
matthew.hamblin@robinsonandhenry.com
jon@robinsonandhenry.com

Attorneys for Plaintiff