1                IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF COLORADO

3    Civil Action No. 23-cv-00736-CNS-NRN

4

5     NICHOLAS MUNDEN,

6            Plaintiff,

7            vs.

8     MICHAEL PINEDA and
      CITY AND COUNTY OF DENVER,

9
             Defendants.

10   ----------------------------------------------------------------

11                        REPORTER'S TRANSCRIPT

12                           Oral Argument

13   ----------------------------------------------------------------

14   Proceedings before the HONORABLE CHARLOTTE N. SWEENEY, Judge,
     United States District Court for the District of Colorado,

15   commencing on the 10th day of August, 2023, in Courtroom
     A-702, United States Courthouse, Denver, Colorado.

16
                              APPEARANCES

17
     For the Plaintiff:

18   JON M. TOPOLEWSKI, Robinson & Henry, 216 16th St., Ste. 750,
     Denver, CO 80202

19
     For the Defendant:

20   KEVIN P. MCCAFFREY, City and County of Denver, 201 West Colfax
     Ave., Denver, CO 80202

21

22

23

24

25        Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
               Denver, CO 80294, 303-335-2108
          Proceedings reported by mechanical stenography;
               transcription produced via computer.

23-cv-00736-CNS-NRN        Oral Argument        08/10/2023    2

1              *         *         *         *         *

2      (The proceedings commenced at 10:00 a.m.)

3            THE COURT:  We're here in 23-cv-736, Nicholas

4  Munden v. Michael Pineda and City and County of Denver.  May

5  I have entries of appearance.

6            MR. TOPOLEWSKI:  Yes, Your Honor.  Jon Topolewski

7  with Robinson & Henry on behalf of the plaintiff,

8  Mr. Munden, who's seated to my left.

9            THE COURT:  Good morning to you both.

10            MR. MCCAFFREY:  Good morning, Your Honor.  Kevin

11  McCaffrey from the City and County of Denver, a law

12  department for the City and County of Denver.

13            THE COURT:  Before we get to argument on the motion

14  to dismiss, I just want to clarify something we noticed in

15  the complaint.  So on claim for relief one, it's listed

16  against both defendants, but that -- I think you'd agree

17  that's not meant to be that way and what you're doing is

18  including them from municipal liability which is really your

19  second claim.

20            MR. TOPOLEWSKI:  Sorry, Your Honor.  Let me just --

21  I believe you are correct.

22            THE COURT:  And I assume that's what the city

23  thought since you just moved to dismiss claim two.

24            MR. MCCAFFREY:  That would be correct, Judge, since

25  I don't believe there could be a claim against the city for

                    Sarah K. Mitchell, RPR, CRR

1   excessive force in and of itself.

2          THE COURT:  Right.

3          MR. TOPOLEWSKI:  Yes, Your Honor.  I will agree

4   that that appears to be correct.  I think the one caveat I

5   will make is two seems to go more towards the limited factor

6   of the failure to train and supervise, as we've briefed, and

7   as is referenced by incorporation.  We're also including a

8   policy or custom as well within the basis for the municipal

9   liability there.

10          THE COURT:  Okay.  Well, is it -- given that, I

11   assume you agree that defendant's motion really covers all

12   theories?

13          MR. TOPOLEWSKI:  I would agree with that, Your

14   Honor.

15          THE COURT:  Okay.  Perfect.  Okay.  With that on

16   the record, let's proceed.  Since it's defendant's motion,

17   I'll hear oral argument from them first, so, Mr. McCaffrey.

18          MR. MCCAFFREY:  Is there any preference, Judge?

19   Should I go --

20          THE COURT:  The podium is great, if you don't mind.

21          MR. MCCAFFREY:  Initially, Judge, the basis upon

22   which defendant moved is twofold.  Primarily that it's the

23   position based on the video evidence presented with the

24   complaint that plaintiff has failed to even show an

25   underlying constitutional violation .  It is clear from the

1    video -- in his complaint plaintiff makes a number of

2    factual allegations which are not supported by the video.

3            One, he initially claims that Officer Pineda

4    violently grabbed him while in the hallway.  That's not

5    supported by what's depicted in the video.  What's depicted

6    in the video is that Officer Pineda was engaged in a long

7    conversation with the plaintiff after being advised by the

8    hotel manager that the plaintiff did not have a right to be

9    present at the location, which is conceded by plaintiff, and

10   that after asking plaintiff to leave the location a number

11   of different occasions, at one point said, We can make this

12   easy, and the response from the plaintiff was, No.

13           At that point it is clear that the officer, Officer

14   Pineda, placed his arm on the defendant -- I'm sorry -- on

15   the plaintiff, and when somebody's not cooperative, you

16   know, the arm placement is a way to lead him out, to direct

17   him out of the location.  As soon as he placed his arm on

18   that -- on plaintiff, the response to plaintiff was

19   excessive, it was unnecessary, and it was violent.  Officer

20   -- Mr. Pineda (sic) cursed at the officer get your F-ing

21   hands off me, that nature, and shoved Officer Pineda.  At

22   that point the body camera video falls to the ground.

23           Plaintiff would like you to disregard what happened

24   inside the stairwell in considering this -- considering

25   whether or not a Fourth Amendment excessive force violation

1    has been alleged, but the Court needs to consider the

2    totality of the circumstances.  What before was a nonviolent

3    encounter turned into an aggressive violent encounter

4    because of plaintiff's conduct, at which point subsequently

5    because the body camera video is on the floor now, the

6    parties disappear, but they reemerge.  You see them again

7    during the surveillance video.

8          In that surveillance video, while there's no sound,

9    it is clear that, again, plaintiff is acting in a way which

10   is unnecessarily aggressive.  At this point now he's

11   assaulted an officer, and Officer Pineda indicates that he

12   was punched in the face after the video camera was -- after

13   the video camera had hit the ground.  Officer -- the

14   plaintiff reenters the hotel lobby followed by the Officer

15   Pineda.  It is clear from that video that Mr. Munden is not

16   being cooperative, and based on the totality of the

17   circumstances, Judge, we must consider what happened in that

18   stairwell to explain the conduct or the belief of Officer

19   Pineda at the time that he encountered him in the hotel

20   lobby.

21         And at one point there's a photograph of plaintiff

22   attempting to grab the baton from Officer Pineda.  Another

23   time there's in the video where Mr. Munden is attempting to

24   push a statue on top of him as he's looking to pick up the

25   baton, and he hides behind the statue.  And Officer Pineda

1   does -- does tase him when Mr. Pineda (sic) is not

2   necessarily looking, looking at his phone.  But what is

3   Officer Pineda to do at this point?  The man is -- this

4   individual has been violent, has attacked the officer, has

5   fled the officer, and now is preventing the officer from --

6   has reentered the location which he was told to leave.  He

7   has -- he's trying to prevent the officer from performing

8   his lawful acts.

9        So Officer Pineda does tase him, at which point

10   plaintiff continues to resist.  He's kicking -- and the

11   video shows this -- kicking while he's on the ground.  And

12   there is -- other officers arrive, at which point he is --

13   even when the other officers arrive, he's still resisting,

14   at which point he is eventually restrained and handcuffed.

15   The independent witnesses who were present at the location

16   who were interviewed by the officers, who were interviewed

17   by the investigating sergeant subsequently confirmed what

18   was -- what's on the video, that plaintiff was acting

19   aggressively.

20        The hotel manager was in the lobby when he observed

21   -- he observed the encounter -- I'm sorry -- was in the

22   stairwell when Mr. Munden attacked the officer.  So, you

23   know, based on the totality of the circumstances, nothing in

24   that video indicates a Fourth Amendment violation or

25   excessive force, and it was plaintiff whose conduct which

1   precipitated it.

2          As to the claim of municipal liability, first, the

3   case should be dismissed initially, Judge, because there's

4   been no Fourth Amendment violation.  Even if the Court was

5   to find a Fourth Amendment violation, based on that video,

6   it is -- Officer Munden (sic) would have a very good claim

7   of qualified immunity under the circumstances.  And if

8   Officer Munden is entitled to qualified immunity, how could

9   it be said that the City and County of Denver was

10  deliberately indifferent to the possibility of excessive

11  force.

12          THE COURT:  And you're saying Officer Munden.  You

13  mean Officer Pineda.

14          MR. MCCAFFREY:  You're right, Judge.  Officer

15  Pineda.  I apologize.  And with respect to the municipal

16  liability under *Monell*, it is -- it is clear based on the

17  allegations in the complaint that plaintiff has not

18  sufficiently alleged *Monell* liability.  In the complaint he

19  primarily relies on the subsequent arrest and I guess

20  investigation which was going on beforehand of Officer

21  Pineda for wage theft, for failing to appear or show up at

22  certain shifts when he was otherwise required to do so.

23          According to plaintiff, that investigation was

24  pending for about a month prior to the -- prior to the

25  incident.  It's the primary basis in the complaint and his

23-cv-00736-CNS-NRN        Oral Argument        08/10/2023      8

1   response to the *Monell* claim -- I mean to the *Monell*

2   liability, the failure to supervise claim.  He talks about

3   failure to train and failure to supervise.  In his complaint

4   it seems to me that the municipal liability claim on that

5   particular branch of the *Monell* test is failure to supervise

6   more than failure to train.  There doesn't appear to be many

7   allegations in the complaint indicating any deficiencies in

8   the training program.  It seemed primarily focused on the

9   failure to supervise.

10          With the failure to supervise claim, again, you

11  know, the -- it's -- with a failure to supervise, I think

12  the courts are clear that the inadequate hiring, training,

13  or other supervisor practices, a plaintiff must demonstrate

14  that the municipal action was taken with deliberate

15  indifference as to its known or obvious consequence.  There

16  is -- when it comes to an alleged dishonesty of Officer

17  Pineda prior to the date of this incident, there is nothing

18  specific about those allegations which would place the City

19  and County of Denver on notice that -- that Officer Pineda

20  was a risk to use excessive force.

21          We can't be deliberately indifferent if we're

22  necessarily on notice.  I mean, the deliberate indifference,

23  you know -- courts have referred to deliberate as an

24  exacting standard, not something that's easily made out, and

25  not something that comes from these particular allegations

23-cv-00736-CNS-NRN    Oral Argument    08/10/2023    9

1    of the dishonesty which would place -- again, place the City

2    and County of Denver on notice that Officer Pineda was a

3    risk to use excessive force, especially with the taser.

4        With respect to the custom and policy, the

5    complaint is really devoid of any factual allegations of

6    custom and policy.  While plaintiff -- I shouldn't say

7    devoid.  I think it is lacking.  Plaintiff does mention a

8    case which was from -- I believe the allegations happened in

9    2012, I believe.  Sorry.  A significant period of time, but

10   a prior case that he cites.  If I could just have a moment,

11   I'll -- a case where he cites where there was some -- where

12   a supervisor with the Denver Police Department has testified

13   about a culture of code of silence.  But, again, those

14   allegations were from a significant period of time prior to

15   this.

16       And there's -- clearly based on those allegations

17   there can -- they're too remote to impute knowledge upon the

18   -- on the City and County of Denver about the potential use

19   of force or excessive use of force.  And plaintiff, while in

20   his opposition to the motion does talk about ratification as

21   something that he's alleged, there's really no facts in the

22   complaint to indicate any sort of ratification.  There's

23   nothing in there, there's no allegation anybody with any

24   final decision-making authority ratified the actions of

25   plaintiff.

Sarah K. Mitchell, RPR, CRR

1       The fact that his supervisor, immediate supervisor

2    investigated the complaint, found the -- found --

3    investigated the use of force, found the use of force to be

4    appropriate isn't sufficient to indicate ratification.  And

5    a ratification of an individual with official policymaking

6    decision-making power.  The only individual he alleges is

7    the sergeant who does the initial -- who does the initial

8    investigation of the use of force.

9       And with respect to the widespread custom, again,

10    he's -- he talks about -- he also points to a news article

11    in his complaint.  The news article talks about murders, for

12    instance.  It doesn't -- when you click on the news article,

13    it doesn't talk about any cases.  It just talks about --

14    places Denver in a list of cases in which there have been

15    police involved shootings, which is completely different and

16    separate from the case we're dealing with right here.  And,

17    again, there are no factual allegations in the complaint.

18    It just talks about -- it just gives statistics, what I see

19    from that article, and it's a very brief article.  It's just

20    statistical analysis without any understanding or conception

21    or recitation of any of the facts of the prior cases.

22       And while plaintiff alleges that -- he tries to

23    show that there's some sort of code of silence or widespread

24    practice by the mere fact that he believes that the officers

25    who responded didn't intervene and that the sergeant

1    conducted what he calls an inadequate investigation of the

2    use of force, all those things happened after, essentially,

3    the alleged use of force.  And I think there are cases, you

4    know, which I cited in the brief which talk about how just

5    those types of things can't place -- even if those

6    allegations were true, even if the failure to intervene and

7    even if there was an inadequate investigation, those types

8    of things can't prove notice on the part of Denver because

9    they existed or they happened after the use of force.  So

10   they can't prove something that happened beforehand.

11           There's a quote that talks about linear time about

12   how it's just not possible that a subsequent investigation

13   into use of force can show deliberate indifference because

14   -- based on linear time.  It comes after the events depicted

15   in the -- alleged in the complaint.  Other than the two

16   complaints -- and one of the cases that he cites in there in

17   his complaint, *Heard*, which was initially the district

18   judge, the district judge found that the use of a taser was

19   excessive use of force.

20           That case went to the Tenth Circuit.  The Tenth

21   Circuit reversed -- granted qualified immunity to the

22   officer and then sent it back to the district court.  The

23   district court entered judgment for the officer on qualified

24   immunity, and then on reconsideration dismissed the case

25   against the City and County of Denver, a municipal

23-cv-00736-CNS-NRN     Oral Argument     08/10/2023     12

1   liability, finding -- in the language finding that the --

2   and, again, as cited in the briefs -- finding that based on

3   the evidence presented in that case, it could not be said

4   that Denver's policy, either formal or informal, with the

5   use of deployment of tasers exhibited deliberate

6   indifference.

7          I think, Judge, based on the failure of plaintiff

8   to sufficiently allege municipal liability, the claims

9   against the City and County of Denver should be dismissed.

10  Thank you.

11         THE COURT:  Thank you.  All right.  Let's hear from

12  the plaintiff.

13         MR. TOPOLEWSKI:  I'll address the defense's two

14  main points which are the excessive force and then the

15  municipal liability second.  As to the argument that there

16  was no constitutional violation, I disagree with the

17  defendant -- the defense's recitation of what the video

18  shows.  What the video shows is an unarmed man in a corner

19  of a hotel lobby shot not once, not twice, not three times,

20  but four times with a taser within a short period of time in

21  between those.  We know from the video that shortly after

22  the first -- I think second tase, reinforcement arrived and

23  was there, which is obviously something that Officer Pineda

24  would know about.

25         But to specifically talk about whether this force

Sarah K. Mitchell, RPR, CRR

23-cv-00736-CNS-NRN    Oral Argument    08/10/2023    13

1    is excessive, what we've pled and what we know is that it's

2    excessive by Denver Police Department standards alone.

3    There was no active aggression that was occurring on

4    Mr. Munden's part at the time he was tased any one of the

5    four times.  Specifically looking at the *Graham* test, which

6    is important for the analysis of whether there is excessive

7    force, I don't see how there could be under that test at

8    this stage an argument that this force was appropriate.  The

9    crime that the officer was brought to investigate was a

10   misdemeanor trespass crime.  That's the first prong,

11   severity of the crime at issue.

12        THE COURT:  Let me ask you while you're there, what

13   about Mr. McCaffrey's argument that we need look at the

14   totality of circumstances, and by the time he was tased, the

15   officer allegedly had been punched in the face, he had tried

16   to grab the baton, he had tried to throw a statue on him.  I

17   mean, don't we look at that as well to see what force is

18   required later?

19        MR. TOPOLEWSKI:  Well, at this stage, Your Honor,

20   and respectfully we'll take the well pled facts, there was

21   no evidence that he was actually punched in the face.  And I

22   think what we can see from the totality is Mr. Munden trying

23   to escape an officer that we've pled has aggressively come

24   at him.  And you can see in the video when he reenters the

25   lobby, the officer immediately is pulling out his baton and

23-cv-00736-CNS-NRN      Oral Argument          08/10/2023     14

1   strikes Mr. Munden multiple times.  Mr. Munden at that stage

2   is somebody who's trying to protect himself.

3           And let's look at the totality and see what happens

4   next.  You know, there is a period of nearly 30, 40 seconds

5   where Mr. Munden is in the corner of the lobby.  There's no

6   way to exit.  There is a statue and an officer pointing a

7   taser at him between any way of getting out of this

8   situation.  Although Mr. Munden was not submitting to

9   arrest, he was certainly not fleeing.  When he left the

10  stairwell, he came back into the hotel.  So there was no

11  risk of this person fleeing, and Officer Pineda was aware

12  that backup that he had called for was en route.

13          So what you see from the video is Officer Pineda

14  taking a potshot at Mr. Munden.  He holds the taser at him,

15  waits for an opportune time when Mr. Munden, again, unarmed,

16  is looking down at his phone, not even making eye contact

17  with the officer, and that's when the officer shoots him

18  with 50,000 volts of force, paralyzing him to the ground.

19  Within seconds later shoots him again the second time, and

20  then within seconds after that tases him two more times.

21          There might be an argument, which we disagree with,

22  that maybe the first tase you could say, well, maybe that

23  was reasonable.  But what about the second?  What about the

24  third?  What about the fourth?  I mean, each one of these

25  acts on top of each other I think clearly establishes that

Sarah K. Mitchell, RPR, CRR

1    under the *Graham* test with the severity of the crime at

2    issue, an important second component is immediacy of a

3    threat to the safety of the officers and others.  Immediacy.

4        So we're not talking about what happened two

5    minutes ago or three minutes ago.  We're talking about is

6    there somebody immediately threatened by Mr. Munden.  And,

7    again, we have an unarmed man in the corner who is standing

8    there.  No civilians were in the area.  He's blocked in.  He

9    can't get out, and you've got an officer with a taser

10   pointed at him.  He's clearly not trying to leave the area

11   at that point.

12       And so I think, you know, if you look at that, if

13   you consider the cases that we cite as well, Your Honor, you

14   know, there's -- there is an appreciation I think by the

15   courts that a taser level force is a severe use of force, a

16   significant use of force, and should only be used in

17   situations where somebody poses that severe level of threat

18   to others.  By Denver Police Department's own standards, and

19   by the standards in *Graham*, that clearly was not -- there

20   was clearly not that threat, an immediate level threat that

21   Mr. Munden posed to anyone at the time he was tased the

22   first time, let alone the second, third, and fourth.  For

23   that reason, we believe that the motion should be denied on

24   that basis.

25       As to the municipal liability, I'll start with

23-cv-00736-CNS-NRN    Oral Argument    08/10/2023    16

1  talking about the failure to supervise.  Officer Pineda at

2  the time that he tased Mr. Munden four times was believed to

3  have committed 23 separate acts of fraud, 23 separate

4  criminal acts that rise to a felony level, acts which if

5  convicted would prevent him from ever serving as a police

6  officer again.  The fact that these acts could restrict him

7  from ever serving as a police officer, we must appreciate

8  that that bears significance as to whether or not the police

9  department should -- or the city should allow somebody who

10  has committed such significant criminal acts that they

11  prevented -- they would be prevented from being an officer

12  to say, well, you've done stuff 23 separate times that we

13  don't think would allow you to ever be a police officer

14  again, and we're going to ultimately charge you with that,

15  but here's a badge.  Here's a taser.  Here's a gun.  Go out

16  and dispense justice.

17      These acts are acts which the legislature and the

18  courts have deemed always relevant to an analysis of what is

19  somebody's character, what it is that somebody is or is not

20  a threat to, and how can they interact, or how do they

21  interact and what's -- what's the justification.  There were

22  rules in place.  Officer Pineda broke those rules 23 times.

23  There were rules in place regarding the use of excessive --

24  use of taser level force.  Officer Pineda broke those rules

25  four times.

Sarah K. Mitchell, RPR, CRR

23-cv-00736-CNS-NRN    Oral Argument    08/10/2023    17

1           There is a direct correlation between those

2   criminal acts and an act infringing upon people's rights.  I

3   think that if you asked a hundred citizens would you be okay

4   if the Denver Police Department employed somebody on the

5   streets on patrol who they believe was a felony level

6   criminal, a hundred of those people would say, no, that's

7   not okay.  And it's not okay in this case.

8           THE COURT:  Well, how do you get around the cases

9   that you've cited to support this idea are -- involve almost

10  identical situations?  So in *Zartner*, that officer had an

11  extensive history of actual misconduct directly related to

12  what he was accused of in that case.  This is somebody

13  accused of fraud.  Essentially, perpetrating a fraud through

14  omissions, essentially.  How would the city know that

15  possibly would lead to an excessive force action?

16          MR. TOPOLEWSKI:  A couple of points on that, Your

17  Honor.  One, there is no frank requirement under a *Monell*

18  analysis that A must equal B, that there must be conduct

19  previously that -- excessive force in order for there to be

20  a belief or deliberate indifference on the part of the city.

21  I think that's just a reductive analysis to say it has to be

22  this and this.  There's nothing else that you can consider.

23  And there are cases that we cite where the Court did

24  consider things beyond just simply what were the prior acts

25  that are related.  They've considered conduct,

1    relationships, a number of other things to say, hey, you

2    should have had some knowledge here that this person was not

3    a good cop and was a danger.

4            I think they've got more than that here.  I mean,

5    they've got 23 separate occasions where this person

6    committed acts that would -- and I don't think that they're

7    passive.  He actively had to submit timesheets showing he

8    was at a place he knew he wasn't and he knew he was going to

9    get paid for those things.  I think that shows a level of

10   criminal capacity that if I'm looking or anyone's looking at

11   their police force, if I know somebody has the capacity to

12   commit criminal acts against the police force, I should

13   probably know that they have the capacity to do that against

14   citizens.

15           And that is the city -- just to point out one of

16   cites the city makes in support of that, you know, there

17   must be like for like.  They cite to *Carney*, and they cite

18   it as we must plead that.  *Carney* just talked about what

19   people have typically pled.  It doesn't say that there's any

20   sort of requirement that the city is indicating must happen

21   in these situations.

22           As to the final point, the custom and practice

23   argument that we've raised for municipal liability, we are

24   at the initial pleading stage.  And that goes to the other

25   argument as well for supervision.  You know, we don't know a

23-cv-00736-CNS-NRN    Oral Argument    08/10/2023    19

1    lot about Officer Pineda other than these criminal acts that

2    he's done in the past.  There may be significant exact like

3    for like things that exist, and I think we should have the

4    opportunity to explore that.

5          But on the custom and practice position, we have

6    pled sufficient facts that there is this code of silence

7    that exists within the police force.  We pled instances of

8    that.  And the point of the argument about what happened

9    after this incident with Mr. Munden, it kind of goes to what

10   the Court in *Andresen*, a case that we cite, said.  The Court

11   in that case considered that as indicative of what the

12   custom and practice is.  The fact in *Andresen* that the

13   officers who had committed an act that was an overstep of

14   their constitutional limitations cleared the officers of any

15   wrongdoing was significant to highlight that, well, there

16   must have been a custom and practice in place if they can

17   look at this and say this is okay.

18         And that's what I think we have here as well.  That

19   these individuals would have access to the video, access to

20   the inconsistencies with Officer Pineda's recollection of

21   events versus what happens in the video, that's important.

22   And the Court says that in *Andresen*.  Let's see, I've got

23   the cite here.  *Andresen* contends that CSPD officers have

24   effected at least eight unlawful arrests since 2009,

25   including one within a year of his own.  He contends that

1  CSPD officers likewise arrested and detained him in a public

2  setting in front of multiple civilian witnesses despite all

3  three officers knowing they lacked probable cause.  And this

4  is the important part.  The officers were neither

5  disciplined nor retrained after this constitutional

6  violation.  I consider these allegations together to

7  conclude that the alleged custom led to plaintiff's harm.

8       And I think that is exactly what we have in this

9  case.  And at this stage of the pleading, I think that we

10  have pled -- plaintiff has pled sufficient evidence not only

11  of acts that exceed the bounds of what Denver says is

12  appropriate, but what the Constitution should protect

13  individuals from.  And that their knowledge about his

14  criminal past, Officer Pineda's criminal past, yet still

15  giving him a badge, giving him a taser, giving him a gun,

16  allowing him to solo patrol certainly created a high

17  probability of risk to people like Mr. Munden, as what

18  happened in this case.  Thank you, Your Honor.

19       THE COURT:  Thank you.

20       All right.  Any rebuttal, Mr. McCaffrey?

21       MR. MCCAFFREY:  Just briefly, Your Honor.  I

22  believe counsel cited -- I believe the case was *Andresen*,

23  the last case that he cited.  And I just note that in that

24  recitation he read he talked about how there's allegations

25  of eight other incidents involving those officers involved

1   in that case.  We don't have that here.  We have no other

2   allegation of any other incident other than this, and I

3   think the cases are pretty clear that you cannot base

4   municipal liability on the facts of what happened with the

5   discipline or the failure to investigate in that specific

6   case.

7        If there are other cases that would combine with

8   that, there's potential to allege that municipal liability.

9   And I believe *Waller* talks about it.  Subsequent failure to

10  discipline cannot be the cause of a prior injury.  And

11  that's Waller against the City and County of Denver at 932

12  F.3d 1277, at page 1290.  And I will agree that the courts

13  will often permit evidence of a prior fraud or misconduct

14  that imputes the honesty of a witness.  The purpose of that

15  testimony or that evidence is not -- is to show that that

16  witness may not be credible to believe.

17        You can't use that type of evidence to show that

18  that individual has a propensity for violence.  That is a

19  step too far, and that's what the plaintiff needs to show.

20  Not just that there is a prior misconduct on the -- by an

21  officer, but that prior misconduct would lead the City and

22  County of Denver to be aware of and to know and to disregard

23  the risk that that individual may commit a subsequent

24  excessive force similar to the allegations of prior

25  misconduct.  Thank you.

Sarah K. Mitchell, RPR, CRR

1      THE COURT:  All right.  Thank you both for your

2  arguments.  At this time I am prepared to rule.  Before the

3  Court is the City and County of Denver's motion to dismiss,

4  which is ECF 17.  For the following reasons the motion is

5  granted.  The parties are familiar with the legal standards

6  governing the Court's analysis of defendants' Rule 12(b)(6)

7  motion.  Under Rule 12(b)(6), a Court may dismiss a

8  complaint for failure to state a claim upon which relief can

9  be granted.  Under Tenth Circuit law a complaint's

10  allegations are read in the context of the entire complaint.

11  To survive a motion to dismiss, a complaint must allege

12  facts accepted as true and interpreted in the light most

13  favorable to the plaintiff to state a claim for relief that

14  is facially plausible.

15      Denver moves to dismiss plaintiff's second claim

16  for municipal liability, but as we've discussed, that would

17  also include dismissal of the first claim to the extent it

18  is brought against it.  The parties largely agree on the

19  governing framework.  To set forth a municipal liability

20  claim under *Monell,* a plaintiff must allege that a

21  municipality or custom causes a plaintiff's constitutional

22  injury, and that the policy or custom was enacted or

23  maintained with deliberate indifference.  That comes from

24  *Schneider v. City of Grand Junction*, 717 F.3d 760, Tenth

25  Circuit, 2013.

Sarah K. Mitchell, RPR, CRR

1      The parties are both aware that regarding the

2  official policy or custom element of municipal liability a

3  plaintiff may show or allege a policy or custom in many

4  different forms, but ultimately this requirement is meant to

5  distinguish acts of the municipality from acts of an

6  employee and ensure that liability only attaches to the

7  municipality for acts for which it is responsible.

8      Regarding causation, a plaintiff must allege a

9  direct causal link between the policy or the custom and the

10  alleged injury.  That comes from *Waller v. City and County*

11  *of Denver*, 932 F.3d 1277, Tenth Circuit, 2019.

12  Fundamentally, the policy or custom pled must actually cause

13  the violation.  And, finally, regarding the municipality's

14  deliberate indifference, a plaintiff must allege that the

15  municipal action was taken with deliberate indifference to

16  its known or obvious consequences.  This standard is met

17  where a plaintiff adequately alleges that a municipality has

18  actual or constructive notice that its act or failure to act

19  is substantially certain to result in a constitutional

20  violation and it deliberately disregards that risk of harm.

21  That's from *Barney v. Pulsipher*, 143 F.3d 1299, Tenth

22  Circuit, 1998.

23      For purposes of ruling on this motion, I'm going to

24  assume without deciding that plaintiff has adequately pled

25  the constitutional violation for excessive force.  It is a

23-cv-00736-CNS-NRN    Oral Argument    08/10/2023    24

 1    close call, but for purposes of this argument I'm going to

 2    assume that burden has been met.  Because Officer Pineda has

 3    not filed any such motion to dismiss, I also won't comment

 4    on qualified immunity except to the extent that that appears

 5    to be a close call as well.  Therefore I'm going to focus my

 6    ruling on the City of Denver's arguments regarding municipal

 7    liability.

 8            The parties seem to agree that the main theories

 9    alleged by plaintiff are failure to train, failure to

10    supervise, and fostering or creating a widespread custom of

11    using excessive force.  First, Denver contends that

12    plaintiff has failed to adequately set forth a claim for

13    municipal liability based on alleged failure to train.  This

14    Court agrees.  Plaintiff has failed to identify or allege a

15    specific deficiency in Denver's training program, sufficient

16    to sustain a municipal liability claim based on failure to

17    train.  Plaintiff has alleged generally that the Denver

18    Police Department condoned and tolerated excessive force in

19    a broad pattern of wrongdoing.  These conclusory allegations

20    are too generalized to support a failure to train claim.

21            The Court further agrees with Denver that although

22    plaintiff alleges that Officer Pineda violated the Denver

23    Police Department operations manual, this is insufficient to

24    show that any training Officer Pineda received was

25    inadequate or that Denver failed to train him.  As the Tenth

Sarah K. Mitchell, RPR, CRR

1    Circuit has explained in *Porro v. Barnes*, 624 F.3d 1322 at

2    1329, a failure to train claim is not viable when it is

3    based on general deficiencies in a training program rather

4    than specific deficiencies.

5         Indeed, as in *Porro*, even reading the complaint in

6    the light most favorable to the plaintiff, he has failed to

7    allege any specific deficiency in Denver's police training

8    that caused his injury rather than simply alleging that

9    Officer Pineda's actions violated the operations manual.

10   This is not enough to sustain a municipal liability claim

11   based on alleged failure to train.

12        Second, Denver contends that plaintiff has failed

13   to adequately set forth a claim for municipal liability

14   based on an alleged failure to supervise and discipline.

15   The Court agrees.  Plaintiff's failure to supervise claim

16   appears to be premised largely on Officer Pineda's alleged

17   wage theft and Denver's alleged failure to supervise him

18   based on his alleged wage theft at the time of the events

19   giving rise to plaintiff's claims.  But the Court agrees

20   with Denver that Officer Pineda's alleged wage theft is far

21   too removed from and unrelated to his alleged use of

22   excessive force.  As such, it can't form the basis for a

23   failure to supervise theory of municipal liability.

24        The Court also believes that the wage theft

25   regardless would not have given Denver sufficient notice of

23-cv-00736-CNS-NRN      Oral Argument        08/10/2023    26

1    a problem with Officer Pineda regarding any alleged

2    excessive force.  This case is notably unlike *Zartner v.*

3    *City and County of Denver*, 242 F.Supp.3d, 1168, D. Colo.

4    2017, where the Court found that a plaintiff stated a

5    plausible failure to train claim where a single officer had

6    a history of 17 excessive force claims and the municipality

7    failed to supervise in light of that officer's extensive

8    history of misconduct.  And I might have said failure to

9    train.  I meant failure to supervise in that case.

10         Here, there are no allegations or arguments that

11   Officer Pineda has a history of similar excessive force

12   claims.  For this reason, plaintiff's argument that there's

13   a causal link between Officer Pineda's wage theft and his

14   excessive force is unavailing.  At bottom, there's just no

15   direct causal link for any failure to supervise Officer

16   Pineda based on his alleged wage theft and plaintiff's

17   alleged injury.

18         Similarly, any failure to investigate the incident

19   as a form of ratification cannot form the basis of a

20   plausible failure to supervise claim.  Plaintiff appears to

21   argue that the alleged failure to investigate or intervene

22   amounts to ratification of Officer Pineda's conduct and that

23   this ratification may sustain his claim.  The Court

24   disagrees.  Post-incident ratification cannot sustain a

25   municipal liability claim as explained in *Estate of Burnett*

Sarah K. Mitchell, RPR, CRR

23-cv-00736-CNS-NRN    Oral Argument    08/10/2023    27

1    *v. Colorado Springs*, 616 F.Supp.3d 1111, D. Colo. 2022.

2         As Denver has noted, any alleged after-the-incident

3    deficient investigation did not cause the underlying

4    constitutional violation which preceded that investigation.

5    Finally, Denver contends that dismissal of plaintiff's

6    municipal liability claim based on an allegedly widespread

7    practice of Denver officers using excessive force is

8    warranted.  The Court agrees at this point.  The complaint's

9    allegations regarding any allegedly widespread custom are

10    largely conclusory.

11         For instance, plaintiff alleges that Denver Police

12    Department has a custom of condoning excessive force.  And

13    to the extent that plaintiff identifies evidence of this, he

14    cites cases from 2013 and one filed in 2017.  Even

15    considering those allegations of misconduct plaintiff has

16    failed to plead sufficient factual content as he must to

17    demonstrate a widespread practice that is so permanent and

18    well settled as to constitute a custom with the force of

19    law.  That is required by *Bryson* at 627 F.3d 784 at 791,

20    Tenth Circuit, 2010.

21         Although plaintiff is not required to allege a

22    certain number of past incidents of excessive force to

23    sustain his municipal liability claim based on this theory,

24    the Court agrees with the City of Denver at this point that

25    given the conclusory nature of his allegations and the

Sarah K. Mitchell, RPR, CRR

1    remote occurrences of arguably well pleaded incidents in the

2    past, he has not alleged content satisfying the policy or

3    custom element.

4         To the extent that plaintiff argues Denver's

5    alleged ratification based on how Officer Pineda's superiors

6    and other officers failed to restrain him for his conduct in

7    this one instance, that also is not enough to sustain a

8    claim based on a theory of widespread custom, not only for

9    the reasons discussed above regarding ratification, but also

10   because this fails to show a well settled custom under

11   *Bryson* and governing Tenth Circuit law beyond Officer

12   Pineda's conduct.

13        Any alleged failure to discipline cannot support a

14   widespread custom theory of municipal liability because, as

15   the Tenth Circuit explained in *Waller*, 932 F.3d at 1290, a

16   subsequent failure to discipline cannot be the cause of a

17   prior injury for purposes of municipal liability.

18   Therefore, dismissal of the municipal liability claim based

19   on this theory is appropriate.

20        For all of these reasons the Court grants Denver's

21   motion to dismiss as to claims 1 and 2.  However, it does so

22   without prejudice, and plaintiff is granted leave to amend.

23   The Court notes that upon amendment plaintiff is advised to

24   ensure that any theories of municipal liability are clearly

25   and distinctively pled.  And I might say, it may behoove the

23-cv-00736-CNS-NRN    Oral Argument    08/10/2023    29

1    plaintiff to wait until some discovery is conducted to do

2    that to ensure he has sufficient allegations to replead this

3    municipal liability.

4        So to the extent plaintiff backs up against the

5    deadline to move to amend, I would suggest moving that out

6    until at least some discovery could be conducted.  You will

7    have to file a motion to do that, and it will probably be

8    referred to Judge Neureiter, but he will have read the

9    transcript likely or consult with me, and that will be

10   probably granted if you have sufficient evidence that has

11   come up during discovery to support such a claim.  But in

12   accordance with the principles that I've just discussed, it

13   needs to be specific and directly targeted at these

14   particular theories of liability.

15       All right.  With that said, does either party have

16   any questions?

17       MR. TOPOLEWSKI:  Nothing from plaintiff, Your

18   Honor.  Thank you very much.

19       MR. MCCAFFREY:  No, Your Honor.  Thank you.

20       THE COURT:  All right.  We'll be in recess.

21       THE COURTROOM DEPUTY:  All rise.  Court will be in

22   recess.

23       (The proceedings were concluded at 10:43 a.m.)

24

25

Sarah K. Mitchell, RPR, CRR

1                      <u>REPORTER'S CERTIFICATE</u>

2

3          I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10         Dated this 17th day of August, 2023.

11

12

13

14         <u>      /s/ Sarah K. Mitchell      </u>

15                SARAH K. MITCHELL
                 Official Court Reporter
16          Registered Professional Reporter
              Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                 Sarah K. Mitchell, RPR, CRR