IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 23-cv-00736-CNS-NRN

NICHOLAS MUNDEN,

    Plaintiff,

v.

MICHAEL PINEDA,

    Defendant.

---

## ORDER

Defendant Michael Pineda moves for summary judgment on Plaintiff Nicholas Munden's two excessive force claims. ECF No. 39. For the reasons below, the Court grants Defendant's motion with respect the Plaintiff's § 1983 excessive force claim and declines to exercise supplemental jurisdiction of Plaintiff's state law claim of excessive force.

## I.    FACTUAL BACKGROUND[1]

On May 9, 2022, Denver Police Officer Michael Pineda responded to a report of a trespasser and a minor disturbance at the Art Hotel in downtown Denver. ECF No. 39, ¶ 1. Upon his arrival at the hotel, Officer Pineda spoke to Faith Riggs, an Art Hotel

---

[1] The following factual recitation is drawn from Defendant's motion, ECF No. 39, Plaintiff's response, ECF No. 43, Defendant's reply, ECF No. 46, and certain exhibits accompanying each. For purposes of the analysis below, the Court construes these facts in the light most favorable to Plaintiff, the non-moving party. *See Allen v. Muskogee, Okla.*, 119 F.3d 837, 840 (10th Cir. 1997).

employee, in the valet lobby. *Id.*, ¶ 2. Ms. Riggs directed Officer Pineda to the fourth floor

stairwell, where he encountered Mr. Munden and Matthew Swisher, the hotel's assistant

general manager. *Id.*, ¶ 3. The following exchange took place between Officer Pineda and

Mr. Munden in the stairwell:

> Officer Pineda: Where is your room key at, then?
>
> Mr. Munden: I'm sorry, what?
>
> Officer Pineda: Your room key. You don't have a room here?
>
> Mr. Munden: I do.
>
> Officer Pineda: So, this is the manager. He says no. So now what? That's a calendar.[2]
>
> Mr. Munden: Yeah, that's an event. That's our scheduled time.
>
> Officer Pineda: For what?
>
> Mr. Munden: That was sent to me -- that was sent to me from Allana.
>
> Officer Pineda: I don't know who that is. Sorry. So, I'm sorry. You have to leave the property or you go to jail.
>
> Mr. Munden: I'm not leaving the property.
>
> Officer Pineda: What?
>
> Mr. Munden: I am not leaving the property.
>
> Officer Pineda: Why?
>
> Mr. Munden: Because this is where I live.
>
> Officer Pineda: Did you just hear what I said?

---

[2] Mr. Munden shows Officer Pineda what appears to be a calendar event on his cell phone. Exhibit B at 00:48.

> Mr. Munden: I've already paid for it.
>
> Officer Pineda: No. No. So put your stuff down. Are you going to leave or not? Huh? Or is there somebody you can call that can confirm this?
>
> Mr. Munden: (Inaudible).
>
> Officer Pineda: Okay. Have her call me or call you so I can talk. And then she can talk to the manager and see what's going on.

*Id.*, ¶ 4.

Officer Pineda then spoke to Mr. Swisher (who was also in the stairwell observing the interaction), who advised the officer that he had received a call from a hotel guest complaining that Mr. Munden had made "some weird comments to the female guest that was working out at the fitness center." *Id.*, ¶ 5.[3] Mr. Swisher told Officer Pineda that he had asked Mr. Munden if he was a guest of the hotel. *Id.* When Mr. Munden could not provide any confirming information, Mr. Swisher asked him to leave. *Id.* Mr. Swisher further advised of a second, similar incident between Mr. Munden and another female in the fitness center. *Id.* Mr. Swisher advised Officer Pineda "at this point, guest or not guest, we're going to ask him to vacate . . . ." *Id.* Mr. Munden then interjected in the conversation between Mr. Swisher and Officer Pineda, stating that he has "already paid multiple times, close to $30,000, and [he has] receipts for all of them." *Id.*, ¶ 6.

Officer Pineda still advised Mr. Munden that he needed to leave: "I'm going to ask you one time to leave the property." *Id.*, ¶ 7. The following exchange then took place:

---

[3] Mr. Munden admits, as he must, that Mr. Swisher told Officer Pineda about the complaints but objects on hearsay grounds. ECF No. 43, ¶ 5. The Court, however, is not taking the statements as true; the Court merely acknowledges the effect of those statements on Officer Pineda encountering Mr. Munden in the stairwell.

> Officer Pineda: Okay. Can I have your ID, please? Let's make this easy, yeah?
>
> Mr. Munden: No.
>
> Officer Pineda: Huh?
>
> Mr. Munden: No.
>
> Officer Pineda: No what?
>
> Mr. Munden: You can't have my ID.
>
> Officer Pineda: Okay. Well, you're under arrest, --
>
> Mr. Munden: I'm not under arrest. Don't fucking touch me. Don't touch me, bro. Get the fuck off of me. Get off of me.
>
> Officer Pineda: (Inaudible).
>
> Mr. Munden: Get the fuck off.

*Id.*, ¶ 8.

After advising Mr. Munden that he was under arrest, Officer Pineda put his hand on Mr. Munden's shoulder to tun him around so that he could apply handcuffs. *Id.*, ¶ 9. After stating "don't fucking touch me," Mr. Munden and Officer Pineda appear to push each other. *Id.*, ¶ 10; ECF No. 43, ¶ 10. During the altercation in the stairwell, Officer Pineda's body-worn camera was knocked off his uniform. ECF No. 39, ¶ 11. The parties dispute what occurred over the next minute.

Officer Pineda testified that Mr. Munden struck Officer Pineda in the mouth with a closed fist and grabbed Officer Pineda's shirt, pulling Officer Pineda toward him. ECF No. 39, ¶ 12. Officer Pineda also testified that Mr. Munden pushed him toward the stairs. *Id.*,

¶ 13. Mr. Munden denies that he punched Officer Pineda or initiated any physical contact with Officer Pineda. ECF No. 43, ¶¶ 10, 12.

Mr. Munden then ran down the stairs, exited the hotel on the street level, and re-entered the valet lobby of the hotel. ECF No. 39, ¶¶ 14–16. Officer Pineda and Mr. Swisher followed. *Id.*, ¶ 14. Mr. Munden entered the valet lobby first, followed by Mr. Swisher. Exhibit 6 at 00:01. Mr. Swisher appears to confront Mr. Munden and then walked back toward the lobby's sliding glass doors. Exhibit 6 at 00:05. Officer Pineda entered seconds later with his wooden baton in his right hand. *Id.* at 00:13; ECF No. 43-1 at 91:1–2 (Mr. Munden describing the baton as a "long wooden, like, old school nightstick"). Upon entering the valet lobby, Officer Pineda testified that he issued commands to Mr. Munden to turn around to be handcuffed, and Mr. Munden refused, electing to assume an aggressive posture. ECF No. 39, ¶ 17; Exhibit D at 00:05; Exhibit G at 00:16. Mr. Munden testified that he did not "recall" whether Officer Pineda issued commands, and he denies taking an aggressive posture. ECF No. 43, ¶ 17.

Officer Pineda then struck Mr. Munden in the left thigh with his wooden baton. ECF No. 39, ¶ 18. Exhibit 6 at 00:21. He later struck him again on or near Mr. Munden's buttocks. Exhibit D at 00:06; ECF No. 39, ¶ 20.

The video then shows Mr. Munden grabbing Officer Pineda's baton.[4] Exhibit D at 00:08. Officer Pineda testified that Mr. Munden was attempting to disarm him, while Mr. Munden testified that he was merely trying to block further baton strikes and caught the

---

[4] Where the videos contradict Mr. Munden's version of the events, the Court need not adopt his version. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997).

baton under his arm. ECF No. 39, ¶ 21; ECF No. 43, ¶ 21. During the physical altercation, Officer Pineda dropped his baton. ECF No. 39, ¶ 23. As he reached down to pick up his baton, Mr. Munden pushed a large sculpture toward Officer Pineda. *Id.*, ¶ 24. Exhibit G at 00:45. Officer Pineda testified that Mr. Munden clearly tried to slide the sculpture onto him, but Mr. Munden testified that he was only attempting to "create a buffer" between him and Officer Pineda. ECF No. 43, ¶ 24.[5]

Officer Pineda next drew and armed his Taser, pointed it at Mr. Munden without deploying the probes, and ordered Mr. Munden to get on the ground or he would tase him. ECF No. 39, ¶ 25. Officer Pineda then pushed the arc button, which served as a warning. *Id.* Mr. Munden again testified that he does not recall Officer Pineda ordering him to get on the ground or saying that he was going to tase him. ECF No. 43, ¶ 25. Mr. Munden then crouched behind the sculpture. ECF No. 39, ¶ 26; Exhibit G at 00:55.

Shortly after Mr. Munden stood up from behind the sculpture, Officer Pineda aimed his Taser at Mr. Munden and deployed the probes, which struck Mr. Munden, causing him to fall to the ground. ECF No. 39, ¶ 27. According to Officer Pineda, Mr. Munden got off the ground a second later, at which point Officer Pineda ordered Mr. Munden to stay on the ground. *Id.*, ¶ 28. Officer Pineda then deployed the Taser probes a second time, to no effect. *Id.*, ¶ 29. Mr. Munden argues that Officer Pineda presents the evidence "out of sequence," arguing that the second tasering occurred while Mr. Munden was still on

---

[5] The Court reiterates that it construes the facts in light most favorable to Plaintiff. *Allen*, 119 F.3d at 840. It merely lays out the opposing positions for context. Moreover, although the Court could (as it expressly does in some instances) conclude that the video evidence "blatantly contradict[s]" Plaintiff's version of certain key events, *Scott*, 550 U.S. at 380—for example, whether Plaintiff was trying to disarm Officer Pineda, or whether Plaintiff attempted to push the sculpture on Defendant—such conclusion would not alter the Court's ultimate decision in this order.

the ground. ECF No. 43, ¶ 28. In this instance, the video Mr. Munden points to plainly shows him standing up while Officer Pineda tases him. Exhibit F at 00:02. Mr. Munden can also be heard yelling, "you fucking got me." *Id.*

Denver Police Officer Logue arrived on scene at this point. ECF No. 39, ¶ 30. Officer Logue's body-worn camera captures Officer Pineda directing Mr. Munden to "get on the ground" at least twice while Mr. Munden, in a crouched position, yells "you got me." Exhibit H at 00:35. As Officer Logue walks around the sculpture, the footage shows Officer Pineda deploying his Taser drive stun (i.e., stun gun) into Mr. Munden's back. *Id.* at 00:40. Mr. Munden argues that he was "already on the ground" at that point. ECF No. 43, ¶ 31. It appears true that Mr. Munden was kneeling on the ground, but if Mr. Munden implies that he was laying on the ground, the video clearly shows otherwise. As seen in the footage, Mr. Munden is first crouched down in a catcher's stance. Exhibit H at 00:35. The body-worn camera then shows Officer Pineda contacting Mr. Munden with his stun gun while Mr. Munden is still somewhat upright. *Id.* at 00:40.

Within 15 seconds of Officer Logue arriving, a third officer can be seen in the video assisting Officer Pineda. *Id.* at 00:53. The parties dispute whether Mr. Munden began hitting Officer Pineda's hands away or grabbing his hands, ECF No. 39, ¶ 33; ECF No. 43, ¶ 33, but the Court has no trouble concluding that Mr. Munden resisted the officers' attempt to control him. *See* Exhibit H at 00:48–01:03. Approximately one minute later, the officers rolled Mr. Munden onto his back and applied handcuffs. *Id.* at 01:45.

The parties dispute how many times Officer Pineda tased Mr. Munden. In his Statement of Additional Disputed Material Facts, Mr. Munden avers that Officer Pineda

7

tased him seven times. ECF No. 43, ¶ 1. For support, he points to his deposition testimony and the Taser log. *Id.* For the former, Mr. Munden testified in January 2024 that Officer Pineda tased him six or seven times, but he acknowledges that on the day of the incident, he said he was tased four times. ECF No. 43-1 at 125:2–8. For the latter, in reviewing the 14-page Taser log, the Court notes that the log only references four "discharges" as opposed to seven discharges as argued by Mr. Munden.[6] ECF No. 43-4 (depicting graphs and data of discharge one on pages 1–4, discharge two on 5–7, discharge three on 8–13, and discharge four on 14).

Mr. Munden was subsequently charged with second-degree assault, criminal attempt to commit disarming a peace officer, resisting arrest, obstructing a police officer, and second-degree criminal trespass. ECF No. 39, ¶ 37. He spent four months in jail and then, in September 2022, he pleaded guilty to first-degree criminal trespass. *Id.*, ¶ 38; ECF No. 39-1 (Munden Dep.) at 137:13–22.

## II.    PROCEDURAL BACKGROUND

On March 23, 2023, Mr. Munden filed his complaint against Mr. Pineda and the City and County of Denver. ECF No. 1. Denver moved to dismiss the second claim for relief: failure to train and supervise under 42 U.S.C. § 1983. ECF No. 17. The Court granted Denver's motion and dismissed, without prejudice, Denver from this case. ECF No. 31. Mr. Munden's excessive force claims—one under federal law (claim one) and the other under state law (claim three)—are the only remaining claims.

---

[6] Mr. Munden failed to cite a "specific reference to material in the record supporting the denial," CNS Civ. Practice Standard 7.1D(b)(4), instead citing Exhibit 8 (ECF No. 43-5) without any pincite. The Court thus cannot accept his self-serving statement that the Taser log indicates seven or eight discharges when the log shows just four.

### III.    LEGAL STANDARDS

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Ledbetter v. City of Topeka*, 318 F.3d 1183, 1187 (10th Cir. 2003); Fed. R. Civ. P. 56(a). The factual record and reasonable inferences must be construed in the light most favorable to the nonmoving party. *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). The moving party bears the initial burden, but once met, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986). Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### IV.    ANALYSIS

#### A.    42 U.S.C. § 1983 Excessive Force Claim (Claim 1)

Mr. Munden brings a § 1983 excessive force claim against Officer Pineda, alleging that Officer Pineda violated the Fourth Amendment. ECF No. 1 (Compl.), ¶¶ 152–65. Officer Pineda contends that he is entitled to summary judgment on Mr. Munden's federal claim under the doctrine of qualified immunity. ECF No. 39 at 13–16. The Court agrees with Officer Pineda and explains why below.

### 1.    Qualified Immunity

The qualified immunity doctrine shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

When a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotations omitted). The "record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 877–78 (10th Cir. 2014) (citation and quotations omitted). When a plaintiff fails to satisfy either prong, the Court must grant qualified immunity. *Id.*

In its discretion, the Court may begin its analysis with either prong. *Cox v. Wilson*, 971 F.3d 1159, 1171 (10th Cir. 2020). Here, the Court elects to begin its analysis with the clearly established law prong.

a.    *Clearly Established Law Prong*

An official's conduct violates clearly established law when, at the time of the challenged conduct, "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (alterations and internal quotations omitted)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). For the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision "on point," or the "weight of authority from other courts must have found the law to be as the plaintiff maintains." *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018) (quotation omitted).

A "prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." *Id.* Stated another way, a plaintiff is not required to cite a case with "identical facts" to demonstrate a clearly established right, *Kapinski v. City of Albuquerque*, 964 F.3d 900, 910 (10th Cir. 2020). Still, clearly established law must place the constitutional issue "beyond debate." *Mullenix*, 577 U.S. at 16 (quotation omitted). It is the plaintiff's obligation to cite cases that satisfy the burden of demonstrating the asserted law is clearly established. *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010) ("The plaintiff bears the burden of citing to us what he thinks constitutes clearly established law.").

Mr. Munden primarily relies on a single Tenth Circuit case to satisfy the second prong: *Perea v. Baca*, 817 F.3d 1198 (10th Cir. 2016). ECF No. 43 at 18–19.[7]

In *Perea*, two police officers were called to perform a welfare check on Mr. Perea and, after finding and pursuing him, pushed Mr. Perea off his bicycle. *Id.* at 1201. The officers did not tell Mr. Perea why they were following him nor asked him to stop pedaling. *Id.* They pushed Mr. Perea off his bike and reached for his hands to detain him, but he struggled, thrashed, and swung a crucifix of unknown size. *Id.* Officers then used a Taser against him—tasering him a total of ten times in two minutes. *Id.* At some point, the officers were able to get Mr. Perea on the ground, on his stomach, with both officers on top of him, effectively subduing him. *Id.* Mr. Perea stopped breathing and turned gray. *Id.* He was transported to the hospital and pronounced dead. *Id.*

The Tenth Circuit concluded that the officers had acted unreasonably, noting that Mr. Perea was tackled for, at most, a traffic violation; he posed no threat before the officers initiated the arrest; and the officers then tased him repeatedly despite not explaining what they were doing or why they were attempting to subdue him. *Id.* at 1203–04. The court stated that "[i]t is—and was at the time of Perea's death—clearly established law in the Tenth Circuit that the use of disproportionate force to arrest an individual who is not suspected of committing a serious crime and who poses no threat to others constitutes excessive force." *Id.* at 1204. "More specifically, it is likewise clearly established that officers may not continue to use force against a suspect who is effectively

---

[7] Mr. Munden also cites *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007), *Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008), and *Fancher v. Barrientos*, 723 F.3d 1191 (10th Cir. 2013). ECF No. 43 at 19. However, he made no effort to analogize the facts of those cases to his case. Still, as Officer Pineda outlines in his reply, those cases are plainly distinguishable. ECF No. 46 at 9–11.

12

subdued." *Id.* The *Perea* court explicitly chose "not [to] set a specific limit on the number

of times an arrestee may be tased within a given time interval." *Id.* at 1205 n.4.

The Court finds that the circumstances in *Perea* are not sufficiently similar to the

circumstances here such that the constitutional issue was "beyond debate." *Mullenix*, 577

U.S. at 16 (quotation omitted). Despite viewing the facts in light most favorable to Mr.

Munden, no reasonable officer could interpret *Perea* to clearly establish that utilizing a

Taser under the circumstances Officer Pineda faced would violate the Fourth

Amendment. First, the various video footage makes clear that Mr. Munden was not

subdued before Officer Pineda utilized his Taser and stun gun.[8] Exhibit G at 00:08–02:01;

*id.* at 00:47 (Mr. Munden pushing large sculpture); Exhibit H at 00:34–02:00. Second, the

video footage also shows Officer Pineda informing Mr. Munden that he was under arrest

and being detained. Exhibit B at 03:25 (Officer Pineda telling Mr. Munden in the stairwell

that "you're under arrest," and Mr. Munden acknowledging the command, responding,

"I'm not under arrest; don't fucking touch me"); Exhibit H at 00:34 (Officer Pineda directing

Mr. Munden at least twice to "get on the ground"). Third, the footage shows Officer Pineda

instructing Mr. Munden to stop resisting—commands that he refused. *Id.* at 00:45 (Officer

Pineda, and potentially the other officers on site, directing Mr. Munden to "turn over," "roll

---

[8] Mr. Munden makes much of Officer Pineda's statement to dispatch that Mr. Munden was "contained" in the corner of the hotel lobby. ECF No. 43, ¶ 27. Mr. Munden appears to conflate contained and subdued, *id.* at 17, 20, but he offers no support for that position. To subdue is to bring a person "under control" whereas containing a person means "to prevent (an enemy or opponent) from advancing or from making a successful attack." *See Subdue*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/subdue (last visited Nov. 5, 2024); *contain*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/contain (last visited Nov. 5, 2024). As explained, the various videos show that Mr. Munden was not "under control" until the officers placed handcuffs on him, and Mr. Munden points to no competent evidence that he was subdued; he merely argues in conclusory fashion that he was subdued. *See* ECF No. 43 at 15 (arguing he was subdued without any record citation); *id.* at 17 (same).

over," and "lay on your belly"). And fourth, unlike Mr. Perea's actions (at most, a traffic infraction), Plaintiff's actions in the hotel stairwell and later in the lobby transformed a routine trespass into a much more serious criminal offense.

The Court reiterates that it is Mr. Munden's "heavy" burden to identify caselaw where an officer acting under similar circumstances as Officer Pineda was shown to violate clearly established constitutional law. *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (quoting *Archuleta v. Wagner,* 523 F.3d 1278, 1283 (10th Cir. 2008)). Stated another way, Mr. Munden was obligated to present clearly established law that is "particularized" to the facts of his case, which he failed to do by only citing *Perea*—a case that is clearly distinguishable. *Flores v. Henderson*, 101 F.4th 1185, 1197 (10th Cir. 2024) ("[T]he clearly established law must be particularized to the facts of the case." (citation and quotation marks omitted)); *id.* at 1199 (reversing denial of qualified immunity for defendant officers because "[n]either the district court nor plaintiffs have identified precedent determining a Fourth Amendment violation occurred under similar circumstances").

Even viewing the facts in light most favorable to Mr. Munden, the Court concludes that Mr. Munden has not demonstrated that, under clearly established law, reasonable officers in Officer Pineda's position would have had fair warning that employing their Taser—whether it was four times or eight times—under similar circumstances violated the Fourth Amendment. The Court therefore finds that Officer Pineda is entitled to

qualified immunity for Mr. Munden's § 1983 claim of excessive force in violation of the Fourth Amendment.[9]

\* \* \*

Because Mr. Munden has not identified precedent finding a Fourth Amendment violation under similar circumstances encountered by Officer Pineda, Mr. Munden has failed to satisfy his burden with respect to the clearly established law prong. The Court need not address the constitutional prong and therefore grants summary judgment in favor of Officer Pineda on claim one. *Felders*, 755 F.3d at 877–78 (10th Cir. 2014) (failure to satisfy either prong requires dismissal on qualified immunity grounds).

### B.    Mr. Munden's State Law Claim (Claim 3)

Where, as here, a district court grants summary judgment on all federal claims, in its discretion, "the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) (emphasis added); *see also* 28 U.S.C. § 1367(c)(3). Because the Court is granting summary judgment on Mr. Munden's sole federal claim, the Court declines to exercise supplemental jurisdiction of his state law claim of excessive.

Accordingly, Plaintiff's state law claim is dismissed without prejudice.

---

[9] Mr. Munden also argues that Officer Pineda's training, Denver Police Department's use-of-force policy, and his expert serve to defeat Officer Pineda's entitlement to qualified immunity. ECF No. 43 at 17–18. "However, violation of a police department regulation is insufficient for liability under section 1983." *Wilson v. Meeks*, 52 F.3d 1547, 1554 (10th Cir. 1995) (citing *Davis v. Scherer*, 468 U.S. 183, 194, (1984)). Further, even if Mr. Munden establishes that Officer Pineda's actions violated Denver Police Department's policies and training, the violation itself does not constitute excessive force and does not per se eliminate the protection of qualified immunity. *See Davis*, 468 U.S. at 194–95. Lastly, Mr. Munden's argument regarding Officer Pineda's credibility, ECF No. 43 at 13, is irrelevant because "[c]redibility determinations . . . are jury functions, not those of a judge" at the summary judgment stage. *Anderson*, 477 U.S. at 255. T

## V.     CONCLUSION

For the above reasons, the Court grants summary judgment in favor of Defendant on Plaintiff's federal excessive force claim and declines to exercise jurisdiction over his state law claim of excessive force. Thus, Defendant's Motion for Summary Judgment [ECF No. 39] is GRANTED in part and DENIED in part. The Clerk of Court is directed to close this case.

DATED this 8th day of November 2024.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge